*POSTED ON WEBSITE*
*NOT FOR PUBLICATION*

**UNITED STATES BANKRUPTCY COURT**

**EASTERN DISTRICT OF CALIFORNIA**

In re                                     )   Case No. 12-30911-E-7
                                          )   Docket Control No. DHL-1
VILLAGE CONCEPTS, INC.                    )
                                          )
                    Debtor.               )
_____  )

**This Memorandum Decision is not appropriate for publication.**
**It may be cited for persuasive value on the matters addressed.**

**MEMORANDUM OPINION AND DECISION**
**OVERRULING OBJECTION TO CHAPTER 7 TRUSTEE'S FINAL REPORT**
**AND FEE APPLICATIONS**

On May 9, 2019, the court conducted the hearing on the Objection to Trustee's Final Report and Applications for Final Compensation filed by Don H. Lee. Dckt. 400. The Trustee's Final Report, Dckt. 395, does not include any "Applications for Final Compensation" with it. In the proposed distributions, it does identify Chapter 11 trustee fees, Chapter 7 trustee fees, and compensation for professionals employed by the respective trustee that are to be made by the Chapter 7 trustee pursuant to separately filed applications which were set for notice hearings.

By orders for each of the applications for trustee fees and compensation, the court has allowed trustee fees and costs for David Flemmer ("Trustee Flemmer") the former Chapter 11 Trustee and the former Chapter 7 Trustee in this case (his successor being appointed after Trustee Flemmer passed away in 2017); trustee fees for Susan Smith the successor Chapter 7 Trustee ("Current Chapter 7 Trustee") who was appointed to replace the late Trustee Flemmer; compensation and expenses the attorneys in the Desmond, Nolan, Livaich & Cunningham law firm serving as counsel

1    for the two trustees ("Trustees' Counsel"), in this case; and compensation for Gonzales & Associates,

2    Inc., accountants for the trustees in this case.  Dckts. 410, 411, 412.  No opposition was filed by Mr.

3    Lee to the motions for trustee fees or professional fees.  Mr. Lee asserts in his Objection and

4    supporting pleadings that he did not receive the three motions and supporting pleadings by U.S. Mail,

5    notwithstanding the Certificates of Service stating that they were mailed to his correct address.  Certs.

6    of Serv.; Dckts. 383, 388, 394.  Mr. Lee states that he subsequently learned of the hearings on those

7    motions mere days before such hearings were conducted on April 4, 2019.  Though learning of those

8    hearings and motions, Mr. Lee has not taken any action to vacate such orders or file oppositions

9    thereto.[1]

10         Mr. Lee asserts that the court's order providing notice of the Trustee's Final Report and the

11   Trustee's Notice ("Final Report Order") sets the deadline for making any objections to the

12   compensation sought by the trustee and professionals in the case.  The Final Report Order (Dckt. 397)

13   states that:

14        "any person wishing to object to the Trustee's Final Report or to any application for
          final compensation . . . that has not already been approved, must file a written
15        objection within 21 days of the date of this notice [which date was March 14, 2019].

16   Thus, Mr. Lee says that his filing of the Objection on April 2, 2019 (19 days after the date of the

17   Final Report Order) was timely.  The hearings on the applications for trustee fees and compensation

18   of professionals was conducted on April 4, 2019.

19         As of the time that the Final Report Order setting the deadlines was issued, the orders

20   allowing trustee and professional compensation had not been issued.  Thus, under Mr. Lee's reading

21

22   _____

23        [1] While appearing *pro se* and not being a licensed attorney, Mr. Lee has had some legal
     education, though not completing law school, as was disclosed to the court in the *Gold Strike*
24   *Heights Homeowers Association* bankruptcy case and related proceedings.  Bankr. E.D. Cal. No.
     15-90811.  In connection with the *Gold Strike* case and related proceedings, Mr. Lee has
25   extensively and aggressively litigated adversary proceedings and claims objections, opposed the
     employment of counsel, filed claims, and prosecuted appeals from adverse rulings as a *pro se*
26   party.  Mr. Lee, as noted by the court in other rulings, has demonstrated a legal ability well
     above the "normal" *pro se* party.  The court is confident that Mr. Lee has the ability to clearly
27   present not only his conclusions, but has provided the court with whatever basis exists in the
     record of this Bankruptcy Case for such conclusions.
28

1  of the Final Report Order, one could argue that reliance on such order is reasonable.[2]

2     The Final Report Order gives notice that there are applications for fees and Mr. Lee was on

3  notice to review them.  Mr. Lee provided his Objection to the fees sought by the late Trustee

4  Flemmer (the Chapter 11 trustee and the prior Chapter 7 trustee in this Bankruptcy Case) and

5  Trustees' Counsel, who served as counsel for Trustee Flemmer as the prior Chapter 11 and Chapter

6  7 trustee and now for the Current Chapter 7 trustee.   Mr. Lee does not object to the $30,589.58

7  contingent fee paid Trustees' Counsel for work in recovering more than $100,000.00 for the

8  bankruptcy estate in this case ("Bankruptcy Estate"), or to the $6,613.06 in fees for the Current

9  Chapter 7 Trustee.

10     Mr. Lee has provided a detailed Objection to the Final Report and Applications for Fees.  He

11  reviews some of the history in this Bankruptcy Case and levels allegations of the case being

12  mishandled by the Trustee Flemmer and Trustees' Counsel.  He asserts that this was for their own

13  economic gain after the Debtor in Possession was removed by the  Hon. Michael S. McManus, the

14  judge to who this case was previously assigned.[3] Mr. Lee provided the court with detailed arguments

15  at the May 9, 2019 hearing.

16     Upon review of the Objection, the Fee Applications to which the Objection relates, the

17  Trustee's Final Report, and the Notice of Deadlines, the court now considers the Objection, including

18  _____

19  [2] Mr. Lee has done the court a favor in identifying this language in the order setting the
   deadlines.  The reference to professional fees harkens back to the day when judges in the District

20  did not require counsel for trustees in "routine" Chapter 7 cases, where there were minimal fees,
   to go through the hoopla of an actual noticed motion.  Instead, back in those days such counsel

21  would file a summary *ex parte* application filed with the final report and an order approving

22  those fees was entered.

23     Those days have long passed, and as required by the Local Bankruptcy Rules,
   professionals for trustees and the bankruptcy estates file and notice their motions/applications for

24  compensation, as the professionals did in this case.  Additionally, given the Chapter 11 trustee to
   7 conversion, and then the first Chapter 7 trustee to a second Chapter 7 trustee handoff in this

25  case,  a noticed application for the allowance and division of the trustee fees was filed and set for

26  hearing.  The court, having this language in the Order identified by Mr. Lee, can now move
   forward to correct it and avoid any confusion in the future.

27

28  [3] This case was assigned to the current Judge when the Hon. Michael S. McManus
   retired in January 2019.

1    as to the trustee fees and Trustees' Counsel compensation, to ensure that Mr. Lee has his Objection

2    considered and avoid any confusion due to the language in the court's order and Mr. Lee's assertion

3    that he had not been served with and given notice of the hearing on the three fee applications.

4    Mr. Lee having received and stating he relied on the Final Report Order setting deadlines and

5    providing notice that for any of the fees requested objections need to be filed by the deadline, Due

6    Process is served and Mr. Lee, to the extent any confusion by the Final Report Order and if there was

7    not notice of the separate hearings on the fee application, has been given full access to the federal

8    court.

9

10                        **REVIEW OF OBJECTION AND REPLY, FEE**
                          **APPLICATIONS, AND RESPONSES**

11            Mr. Lee, a creditor who has filed his general unsecured claim in this case, filed his Objection

12    To Trustee's Final Report And Applications For Final Compensation on April 2, 2019. Dckt. 400.

13    Mr. Lee filed Proof of Claim No. 34-1 in this case, asserting a $6,000.00 general unsecured claim

14    for "services performed." Attached to Proof of Claim No. 34-1 is a letter dated September 11, 2011,

15    from Village Concepts stating that it memorializes the understanding that Mr. Lee will: (1) conduct

16    an investigation of the properties and interview witnesses; (2) conduct "legal research" that Adam

17    Weiner and/or Brian Cullen (the California State Bar lists attorneys with these names licensed to

18    practice law in the State of California) will need prior to a February 2012 trial; (3) prepare documents

19    that Adam Weiner and/or Brian Cullen will need prior to and for trial; (4) prepare defense exhibits

20    and exhibit blow-ups that Brian Cullen will need at trial; and (5) attend the trial and assist Brian

21    Cullen with administrative tasks at trial. For the above services, Mr. Lee was to "collect" $6,000.00

22    from the Debtor.[4]

23    ─────────────────

24            [4] This Agreement for services includes Mr. Lee providing "legal sounding services" in
        the nature of conducting legal research that Adam Weiner and Brian Cullen (who are identified
25      as attorneys by the California State Bar) will need. Additionally, Mr. Lee will prepare all
        "documents" that the attorneys will need, as well as the defense (Debtor's) exhibits. As drafted,
26      this contract between Mr. Lee and Mark Weiner as president of the Debtor appears to have Mr.
        Lee determining what legal research, documents, and exhibits that the attorneys will need, as
27      opposed to "assisting" in research, document preparation, and exhibit preparation as directed by
        licensed attorneys. This wide range of legal services is consistent with the legal knowledge and
28

                                                      4

**Summary of Final Report**

Before focusing on the specifics of the Objection, the court reviews the Trustee's Final Report that was filed on March 14, 2019. The information provided in the Trustee's Final Report (Dckt. 395) is summarized as follows:

| | | | |
|---|---|---|---|
| **Total Monies for Disbursements Other Than to Debtor** | $324,003.25 | **Trustee Fees Computed Pursuant to 11 U.S.C. § 327 Maximum Percentages and Expenses** | |
| | | | |
| **Disbursement for Administrative Expenses (other than Trustee and Professionals) and Creditor Claims** | | **Trustee Susan Smith** (Allowed - April 7, 2019 Order, Dckt. 412). | |
| | | Trustee Fees | ($6,613.06) |
| **Administrative Expenses (including post-petition taxes, costs of sale, bond)** | ($23,201.96) | | |
| | | **Former Chapter 11 and Chapter 7 Trustee David Flemmer** (Allowed - April 7, 2019 Order, Dckt. 412). | |
| **Priority Claims** | ($100.00) | Trustee Fees | ($12,837.12) |
| **($1,708,135.98) of General Unsecured Distribution** | ($54,864.07) | Expenses | ($57.00) |
| | | | |
| **Secured Claims Paid** | ($125,100.00) | **Professional Fees** | |
| | | | |
| | | **Gonzales & Sisco, LLP; Accountant For Trustee** (Allowed - April 7, 2019 Order, Dckt. 411) | |
| | | Fees | ($8,140.00) |
| | | Expenses | ($21.00) |

ability that Mr. Lee has demonstrated in the other bankruptcy case, contested matters, and adversary proceedings in this court.

| | | | |
|---|---|---|---|
| | | | |
| | | **Desmond, Nolan, Livaich, and Cunningham; Attorney for Chapter 7 Trustee** (Allowed - April 7, 2019 Order, Dckt. 410) | |
| | | Fees | ($77,524.58) |
| | | Expenses | ($7,029.82) |
| | | | |
| | | **Percentage Comparison** | |
| **Total Claims Paid** | ($180,064.07) | 55.6% of Total Estate Funds | |
| **Administrative Expenses (Excluding trustee and professional fees and expenses)** | ($23,201.96) | 7.2% of Total Estate Funds | |
| | | | |
| **Attorney's Fees and Expenses** | ($84,554.40) | 26% of Total Estate Funds | |
| **Accountant Fees and Expenses** | ($8,161.00) | 2.5% of Total Estate Funds | |
| **Susan Smith Trustee Fees and Expenses** | ($6,613.06) | 2% of Total Estate Funds | |
| **David Flemmer Trustee Fees and Expenses** | ($12,894.12) | 4% of Total Estate Funds | |

At the May 9, 2019 hearing, Mr. Lee argued that the secured claims paid and work done by the trustees and Trustees' Counsel relating thereto are illusory services for which compensation should not be allowed. Mr. Lee asserts that the sales to generate the monies to pay secured claims of Textron Financial Corp. ("Textron") were of no benefit to the creditors holding general unsecured claims. Mr. Lee did not direct the court to any specific sales for that contention, but did state that when the court reviewed the record in this Bankruptcy Case, the court would see that there was no value to creditors with unsecured claims from such sales.

/ / /

/ / /

/ / /

1  At this point the court notes that a bankruptcy trustee's duties run to the bankruptcy estate, not to a

2  specific creditor or group of creditors.[5]  Generally, even though creditors with general unsecured

3  claims are at the bottom of the payment list,[6] actions to benefit the bankruptcy estate will also often

4  ultimately benefit creditors holding general unsecured claims - but not always.  There may be

5  significant priority unsecured claims that will soak up all of the monies generated, leaving nothing

6  for creditors holding general unsecured claims.  A trustee properly administering a case will incur

7  expenses in generating the monies to pay those priority unsecured claims, while there will be nothing

8  for general unsecured claims.  In such a situation, the creditors with general unsecured claims cannot

9  be heard to validly assert that the trustee breached his or her duties by not "extorting" a portion of

10 the monies from creditors with priority unsecured claims.  The threat to extort such payment would

11 be the trustee refusing to administer the assets of the bankruptcy estate to pay priority unsecured

12 claims unless and until the creditors with such priority unsecured claims waived a portion of their

13 priority claims as a "payoff" to creditors with unsecured claims.

14         Conversely, if a creditor's secured claim would exhaust all of the proceeds from the sale of

15 property of the bankruptcy estate, and such a sale does not otherwise benefit the estate (e.g. where

16 satisfying a creditor's claim from the sale of one property removes the lien on another property), a

17 trustee is hard pressed to explain why doing a sale in exchange for a carve out in an amount only

18 equal to trustee fees and trustee's counsel's fees is consistent with the trustee's fiduciary duties to the

19 bankruptcy estate.  In such situations, the trustee properly exercising the rights of the bankruptcy

20 estate obtains a carve out from the creditor's sales proceeds in an amount not only to pay the trustee

21 fees, but obtain a reasonable amount of money for the bankruptcy estate free and clear of such lien.

22 Such is not "extorting" a "payoff," but the trustee recognizing the value of his or her power to sell

23 property of the bankruptcy estate in lieu of a creditor having to go through the cost and expense of

24 foreclosing on, insuring, protecting, marketing, and then selling collateral.

25 / / /

26 _____

27      [5] 11 U.S.C. §§ 704,  1106.

28      [6]  11 U.S.C. § 726.

At the other end of the spectrum, a trustee cannot be pressured into inaction because someone who owes an obligation to the bankruptcy estate threatens to make the litigation so expensive that the trustee and counsel fees would consume most of what is recovered from the litigation. This could be a debtor, transferee of a fraudulent or preferential conveyance, or person who owes some other obligation to the bankruptcy estate. Such obligor cannot "extort" the trustee into not enforcing the rights and interests of the bankruptcy estate based upon a contention (such as Mr. Lee makes) that there is a *per se* rule that administrative expenses, fees, or compensation cannot exceed the distribution made to creditors holding general unsecured claims.

The bankruptcy laws do not reward those who seek to misuse the federal courts and judicial process. There are cases where, due to the obstreperous conduct of a creditor, transferee of an avoidable transfer, debtor, or other insiders of the debtor, a bankruptcy estate is rendered administratively insolvent (the administrative expenses being greater than the monies in the case). In those unfortunate cases, the trustee and professionals consume all of the monies of the estate and creditors with unsecured claims get nothing - not because of an abuse by the trustee or professionals, but because of the creditor, transferee, debtor, insider, or other obstreperous party engaged in unreasonable conduct to try and abuse federal law. Such unreasonable conduct cannot be used to block a trustee from properly administering assets of the bankruptcy estate.

### REVIEW OF BANKRUPTCY CASE FILE CONCERNING
### SALES AND TEXTRON CLAIM

In neither the Objection nor the Reply does Mr. Lee identify any specific sales or disbursements to creditors holding secured claims, other than saying that the sales of collateral securing the claims of Textron were of no benefit to the Bankruptcy Estate. Dckts. 400, 425. As suggested at the hearing by Mr. Lee, the court has reviewed and now summarizes various sales and proceeds recovered for the Bankruptcy Estate.

Beginning with the information in the Trustee's Final Report to which Mr. Lee now objects, the court identifies sales of property of the estate pursuant to motions identified with Docket Control Nos. DNL-8, DNL-9, DNL-10, DNL-11, DNL-14, and DNL-18.

/ / /

On October 30, 2013, Trustee Flemmer filed a Motion to Approve Sale of Equipment and Recreational Vehicles (DCN: DNL-8). Dckt. 215. The assets of the Bankruptcy Estate being sold are identified in the Motion as:

> (1) three Bobcats; (2) Cat Backhoe; (3) Skiploader; (4) Apache Utility Trailer; (5) Genie Lift; (6) Roller; (7) Equipment Trailer; (8) D8 Cat; (9) Euclid Scraper; (10) Euclid Engine and Tires (collectively"Equipment"); and the following Recreational Vehicles ("RVs"): (1) 1997 Fleetwood Wilderness (VIN 1ED5X3027V2384526); (2) 1994 King of the Road (VIN 1DR1F4038RB006213); (3) 1997 Fleetwood Park Model (VIN 1EA8D3928V2834315); (4) 1996 SkylineAljo (VIN 15Y300D2D000375); (5) 1999 Arctic Fox (VIN 4N15E2929X0106983); (6)2005 Cougar High Country (VIN 4 YDF28521413044965); and (7) 2005 Thor/Dutchman Colorado (VIN 47CFCRPZX5R651439).

*Id.* at 1:20-27. The buyer is identified as Mark Weiner, who is the principal of the Debtor, with the property sold subject to all liens and encumbrances. *Id.* The hearing on the Motion DCN: DNL-8 was conducted on December 3, 2013, and the successful purchaser at the sale was ANDCO Farms, the highest overbidder, for $35,000.00. Order, Dckt. 248. Mark Weiner was the approved backup buyer if the sale to ANDCO Farms was not completed. Trustee Flemmer's Report of Sale discloses that the estate received $35,000.00 from ANDCO Farms. Dckt. 286.[7]

On November 25, 2013, Trustee Flemmer filed a Motion to Sell Manufactured Home (DCN: DNL-9). Dckt. 232. That Motion sought approval of a sale of: (1) Skyline 4203-CT (Serial No. 8V700174VA/B); and (2) Fuqua Riverpointe 0070D (Serial No. 20486A) to Calaveras Valley Village, LLC, for the purchase price of $51,548.00. *Id.* at 1:20-22. This sale was made free and clear of the lien of Textron, with the Bankruptcy Estate receiving $51,548.00. Order, Dckt. 252; Trustee Flemmer's Report of Sale, Dckt. 288.

Trustee Flemmer filed a second Motion on November 25, 2013, (DCN: DNL-10) to sell a manufactured mobile home identified as Fuqua Homes 1413 (Serial No. 20413A/B) to Castle Village, LLC for $40,798.00. Dckt. 237. This sale was made free and clear of the lien of Textron, with the Bankruptcy Estate receiving $40,798.00. Order, Dckt. 253; Trustee Flemmer's Report of Sale, Dckt. 292.

---

[7] The dollar amounts stated are the proceeds received from escrow, after costs of sale, but before payment to Textron for its secured claim. The sales, payments, and computation of benefit to the Bankruptcy Estate is discussed in the next section of this Ruling below.

A third Motion to Sell was filed by Trustee Flemmer on November 25, 2013, (DCN: DNL-11) to sell a manufactured mobile home identified as Fuqua Homes First Pointe to John Ferreira for $53,259.00. Dckt. 242. This sale was made free and clear of the lien of Textron, with the Bankruptcy Estate receiving $53,259.00. Order, Dckt. 254; Trustee Flemmer's Report of Sale, Dckt. 290.

On May 16, 2016, Trustee Flemmer filed a Motion to Sell real and personal property (DCN: DNL-14) identified as:

(1) unimproved real property generally identified as 3093 Dyer Way, Placerville, CA; 3005 Dyer Way, Placerville, CA; 3124 Dyer Way, Placerville, CA; and 3025 Buck Board Rd., Placerville, CA; (2) Fuqua 2 Story Manufactured Home [VIN 20429A, 20429B, 20429C, 20429D]; (3) CVV 13 Manufactured Home [VIN 00905L3463B15769B, 00905L3463Bl5769A]; (4) 2000 Forest River 36' RV [VIN 4X4FWDM27YC034274]; and (5) the estate's interest in easements in gross granted to the Debtor by Nancy Weiner; G. Chris Larson, Trustee of the Floyd H. Pettit Trust dated January 4, 1994; and Norman Pettit Loudon, and all related water use agreements, for certain real property located in El Dorado County, California, more particularly described in the grants of easement attached to the sale agreement, to Village Concepts, LLC. for the purchase price of $10,000

Motion, pp. 1:20.5-27.5, 2: 1-2; Dckt. 293. The sale to Village Concepts, LLC was approved by the court. Order, Dckt. 302. This sale of the assets was subject to the liens of creditors, including Textron.

On January 11, 2018, the Current Chapter 7 Trustee filed her Motion to Sell the estate's interest in a note to ANDCO Farms, Inc. for $8,000.00 (DCN: DNL-18). Dckt. 335. The Motion was granted and the sale for $9,500.00 to overbidder at the hearing Roger Gonzales was approved. Order, Dckt. 342; Trustee's Report of Sale, Dckt. 352.

**Recovery of Monies or Other Benefit For the Bankruptcy Estate From Sales**

From these sales of assets the Bankruptcy Estate received $200,105.00. A review of the Cash Receipts and Disbursements Record, Form 2, filed with the Trustee's Final Report, the payments to Textron on its secured claim from the sales is reported as:

Sale Motion DNL-11 ..................................$52,500 Sales Proceeds

Payment to Textron on Lien.............($47,500)

Net to Bankruptcy Estate............................$ 5,000

10

1  Sale Motion DNL-10 ...................................$40,000 Sales Proceeds

2    Payment to Textron on Lien..............($35,000)

3      Net to Bankruptcy Estate.............................$ 5,000

4  Sale Motion DNL-9 ....................................$30,789 Sales Proceeds

5     ......................................................$20,759 Sales Proceeds

6    Payment to Textron on Lien..............($26,300)

7    Payment to Textron on Lien..............($16,300)

8    Registration and Escrow Fees............($ 948)

9      Net to Bankruptcy Estate.............................$ 8,000

10  Sale Motion DNL-8 Net to Bankruptcy Estate (No Liens Paid)........$35,000

11  Sale Motion DNL-14 Net to Bankruptcy Estate (No Liens Paid).......$10,000

12  Sale Motion DNL-18 Net to Bankruptcy Estate (No Liens Paid)........$ 9,500

13 Dckt. 395 at 19-25.

14   For the sales of property subject to the Textron lien for which Textron was paid a portion of

15 the sales proceeds, the gross sales proceeds were $144,048.00 in gross sales proceeds, ($125,100.00)

16 paid to Textron, and after costs and expenses of the sales, $18,000.00 net monies for the Bankruptcy

17 Estate.

18   In addition, there was $54,500.00 in assets sold for which Textron was not paid a portion of

19 the proceeds of the sale. Of the total $72,500.00 in net sales proceeds received by the Bankruptcy

20 Estate, twenty-five percent (25%) was generated by the sales of assets for which a portion of the

21 proceeds were used to pay Textron's secured claim.

22 Textron's Unsecured Claim Not Increased

23   In reviewing the proposed distribution on general unsecured claims, there is a $28,432.74

24 general unsecured claim for Textron. Dckt. 395 at 34. Textron's Claim filed in this case was in the

25 amount of $476,144.59. Proof of Claim No. 9-1. Of that $447,720.85 was asserted to be secured and

26 $28,423.74 was stated to be unsecured. The UCC-1 financing statement and security agreement

27 attached to Proof of Claim No. 9-1 contains broad "all equipment and inventory" and proceeds

28 language.

1    The court does not find any orders granting Textron relief from the stay or otherwise being

2  able to proceed against any other collateral.  On Schedule D the Debtor states, Mark Weiner signing

3  the Schedules under penalty of perjury, that the Textron Claim is ($483,286.75) and is fully secured.

4  Dckt. 26 at 14.

5    The Claims Proposed Distribution Report states that on its secured claim Textron is to be paid

6  only the $125,100.00 of its ($447,720.85) secured claim.  Dckt. 395 at 29.  None of the undersecured

7  difference between the ($447,720.85) secured claim and the $125,100.00 payment, which totals

8  ($323,620.85) is added as an unsecured claim in this case.

9    Based on the evidence presented, the sales that Mr. Lee complains of being no benefit to the

10  creditors holding general unsecured claims, actually reduced the unsecured claim pool (Textron not

11  amending its unsecured claim when its collateral did not pay the secured claim in full,[8] whether for

12  only the amounts received by the Bankruptcy Estate from the sales proceeds or the entire shortfall

13  in what it actually recovered on its collateral), and did benefit the Bankruptcy Estate and creditors

14  holding general unsecured claims.

15  **Objections to Claims**

16    In addition to selling assets, the two trustees in administering the Bankruptcy Estate objected

17  to claims filed, decreasing the amount of claims dividing whatever money would go to creditors

18  holding unsecured claims.

19    Current Chapter 7 Trustee filed her Objection to Proof of Claim No. 35-1 that was filed by

20  the Kopp Family Trust in the amount of ($1,831,995.73).  Dckt. 356.  The Objection was sustained

21  and the Kopp Family Trust Proof of Claim No. 35-1 was disallowed in its entirety.  Order, Dckt. 368.

22  The Objection was based on the Kopp Family Trust, for which Mark Weiner (principal and president

23  of the Debtor) and Nancy Weiner, his spouse, were the trustees and sole beneficiaries not having

24  provided sufficient documentation of there being such an obligation for the asserted ($1,831,995.73)

25  general unsecured claim.

26  / / /

27  _____

28    [8]  See 11 U.S.C. § 506(a) for amount of secured claim and computation of unsecured
     claim as amount in excess of the collateral securing the claim.

In addition to Mark Weiner being the president of the Debtor, the court's findings in ruling on the Objection include:

> As the trustee does not have documentation evidencing the loans and transfers pertaining to the loans, the claimant should establish the claim. This is especially true in this case, as the **claimant** [Kopp Family Trust] **is an insider**. The **debtor's president Mark Weiner** and his wife **are the trustees** and **sole beneficiaries of the Kopp Trust**. And **the trust is the sole shareholder of the debtor**. Docket 358.

Civil Minutes, Dckt. 363 at 2 (emphasis added).

No opposition was filed by the Kopp Trust, and it's trustees, Mark Weiner and his spouse, offered no evidence of a basis for the Kopp Trust being owed ($1,831,995.73) by the Debtor. As discussed below, a Chapter 11 trustee was appointed in this case based on Mark Weiner's conflict of interest. Presumably, if there had been a good faith basis for having a claim for almost $2,000,000.00 in this case, the Kopp Trust (sole shareholder of Debtor) and Mark Weiner (president of Debtor and trustee and beneficiary of the Kopp Trust) as the trustee of the Kopp Trust would have presented evidence thereof in responding to the Objection (as well as clearly included it with the proof of claim in light of the conflicts and multiple legal hats worn by Mr. Weiner).[9]

This asserting an unsupported claim for almost $2,000,000.00 and then just allowing it to be objected to and disallowed without opposition is relevant in light of Mr. Lee's assertion that if Judge McManus would have just left the Debtor in Possession and Mr. Weiner in charge it would have all worked out and even unsecured creditors would have been paid. The ignoring of these serious

---

[9] Proof of Claim No. 35-1 filed by the Kopp Family Trust and signed by Mark Weiner as trustee of the Trust, has attached to it a ledger sheet showing various transaction (which Judge McManus found to be insufficient as documentation of an obligation). The stated basis for the claim is "Money loaned to debtor." Upon closer review, this is not purported to be a loan ledger but is titled:

Village Concepts, Inc. 2010.1_2011.12
General Ledger
For the Period From Jan 1, 2010 to Dec. ¶ 31, 2011

Proof of Claim 25-1 at 3. The first entry is for December 31, 2010 "YE Adj entri Gen" with the "Trans Description" being stated as "adj retain earnings" and a "Credit Amt" of $1,471,731.68 shown. The next lien shows the same "Credit Amt" but then a negative "Balance" of "-1,471,731.68." This appears to be the General Ledger for Village Concepts, LLC showing a large negative equity for the sole shareholder, Kopp Family Trust, not a loan.

1  conflicts and not documenting an asserted $2,000,000.00 claim indicates a conflict that may have

2  been broader than discussed by Judge McManus.

3        Current Chapter 7 Trustee also objected to the claim of Daniel Gryder and Shannon Legorreta,

4  Proof of Claim No. 5-1, asserted in the amount of ($225,000.00).  Objection, Dckt. 361.  The

5  Objection asserted that this obligation had been settled in full with insurance proceeds for $15,000.00

6  and that these two creditors had signed a release on December 11, 2012 (which was after the July

7  2012 filing of Proof of Claim No. 5-1).

8        The court sustained the Objection and the ($225,000.00) claim was disallowed in its entirety.

9  Order, Dckt. 369.

10
11
### OBJECTION TO FINAL REPORT, TRUSTEE FEES OF DAVID FLEMMER, AND TRUSTEES' COUNSEL IN THIS CASE

12        As stated above, Proof of Claim No. 34 filed by Debtor is for a $6,000.00 general unsecured

13  claim.  That is 00.35% of the total unsecured claims.  For every $10,000.00 in increase of distribution

14  on general unsecured claims, Mr. Lee's portion would be $35.12.

15        The Objection states the following grounds with particularity (FED. R. BANKR. P. 9013) as

16  the basis of objecting to the Trustee's Final Report:

17        1.    The administrative fees and costs in this case are unreasonable given the scope
18              of this Chapter 7 bankruptcy proceeding and the proposed distribution to the
                unsecured creditors which is approximately one-third of the total
19              administrative fees and costs that have been previously paid.

20        2.    The certifications submitted in support of the administrative fees and costs
                sought by the Chapter 7 Trustee, Susan K. Smith's ("Current Trustee"),
21              professionals are inadequate to support the fees being sought.

22        3.    The former Chapter 7 Trustee, David Flemmer ("Former Trustee"),
                improperly sought conversion of this case to Chapter 7 on the basis there were
23              fraudulent transfers that needed to be unwound. However, Debtor prevailed
                in that Adversary Proceeding. But for the improper conversion of the case to
24              Chapter 7 by Former Trustee, unsecured creditors would have received more
                than 3.2 percent on their claims. The unreasonable administrative fees and
25              expenses are two-thirds of the estate funds collected by the Former and
                Current Trustees.

26  Objection, Dckt. 400.

27  / / /

28  / / /

14

1   Along with the Objection, Mr. Lee filed a Memorandum of Points and Authorities ("Lee

2   Memo"). Dckt. 403. In addition to what is argued in the Objection, Mr. Lee argues that the Trustee's

3   Final Report does not establish that administrative expenses for Trustee Flemmer and Trustees'

4   Counsel were reasonable because only Trustee Flemmer, whom has passed away, could certify those

5   fees.

6   The Objection asserts that for the now more than six years since the case was converted to

7   Chapter 7, the spending "years of fee churning in an attempt to make up for the lucrative

8   opportunities lost when this court ruled in favor over the Debtor . . . that no fraudulent transfer of

9   assets had ever taken place."

10   The remainder of what is argued in the Lee Memo is essentially two points: (1) Trustee

11   Flemmer and other professionals of the Estate worked to intentionally generate administrative

12   expenses, and (2) the administrative expenses in this case are unreasonable in light of the recovery

13   received on unsecured claims.

14
    **Additional Grounds As Stated in Reply**
15   **to Current Chapter 7 Trustee's Opposition**

16   On May 1, 2019, Mr. Lee filed his Reply and Objection to the Declaration of Current

17   Chapter 7 Trustee. Dckts. 424, 426. Mr. Lee argues that because Current Chapter 7 Trustee only

18   opposes the Objection on alleged procedural grounds, that the substantive grounds for objection have

19   been conceded. He further includes his assertion that he did not receive notice of the motions for

20   compensation.

21   Mr. Lee also makes an evidentiary objection to the Current Chapter 7 Trustee's testimony in

22   her declaration which testimony is:

23      It is my understanding that the applications were set on 28 days' notice and [Mr. Lee]
        was served with the applications, notices of hearing, and accompanying declarations
24      and exhibits.

25   (Declaration ¶ 2, Dckt. 422), asserting that the above is inadmissible hearsay and does not meet the

26   requirement for personal knowledge testimony. At the May 10, 2019 hearing, the court sustained this

27   evidentiary objection. In sustaining the evidentiary objection the court noted that in the court's own

28   files are the certificates of service attesting to such service. While such "understanding" of the

1   Current Chapter 7 Trustee is not the evidence of service, the certificates of service themselves filed

2   with the court provide evidence of such service.

3          In his Reply Mr. Lee provides a legal analysis of the Mailbox Rule, cites to Ninth Circuit

4   authorities, and argues the legal basis for his contention that based on the facts and proper application

5   of law, "LEE has successfully rebutted this [Mailbox Rule] presumption with his unequivocal denial

6   of receipt of any notice and his claim that he was but one of 116 alleged recipients and that on its

7   face, raises considerable doubt that all 116 were actually mailed the disputed notices."  Reply, p.

8   5:21-23; Dckt. 424.

9          While Mr. Lee provides a sophisticated legal argument and weaves a contention based upon

10  asserted facts, merely because he asserts that he did not receive the notices and pleadings does not

11  present conclusive evidence to counter the presumption arising from the statements under penalty of

12  perjury that the pleadings were mailed to him.  Further, merely his conclusion that his saying he did

13  not receive the documents creates "considerable doubt that all of the 116 were actually mailed" is not

14  an accurate statement.

15         Though Mr. Lee clearly had actual knowledge of the fee motions at least a week (based upon

16  his testimony under penalty of perjury in his Declaration, ¶ 4, Dckt. 402) or days before the April 4,

17  2019 hearing as he argued at the May 9, 2019 hearing on this Objection, he chose to do nothing with

18  respect to those matters.  He did not show up at hearings asserting defective notice.  He did not file

19  any motions to vacate and allow him to present opposition to the motions.  Rather, he elected to

20  pursue his objection to fees of Trustee Flemmer and Trustees' Counsel through this process.

21         Notwithstanding this curious lack of action by someone who states such disapproval of the

22  conduct of Trustee Flemmer and Trustees' Counsel, the court is considering those objections now,

23  not shutting the judicial door to Mr. Lee.  In part this is based on the form of the court's order.  In

24  larger part there is no discernable prejudice caused by any delay in ruling on this in May 2019 when

25  the hearing on the motions were conducted just a month earlier in April 2019.  Trustee Flemmer's

26  estate, the Current Chapter 7 Trustee, Trustees' Counsel, and Mr. Lee can all know that the judicial

27  process has worked to consider all grounds for and in opposition to such fees.

28  / / /

**Asserted Unreasonableness of Trustee**
 **and Attorney's Fees**

Mr. Lee then addresses a significant and sophisticated legal issue concerning fees of trustees and professionals, one in which the Eastern District of California has been in the vanguard of address. Mr. Lee directs the court to the unpublished decision of the Hon. Christopher M. Klein, *In re Dry-Mix Products Company, Inc.*, 11-21956 (Bankr. E.D. Cal. 2014). That unpublished decision is actually part of a larger published decision involving several unrelated cases concerning the issue of the proper compensation of the reasonable commission fees for a trustee, *In re Scoggins*, 517 B.R. 206 (Bankr. E.D. Cal. 2014). All of the other active and recall bankruptcy judges for the Eastern District of California signed on concurring in Judge Klein's decision in *Scoggins*. *In re Scoggins*, 517 B.R. at 227-228.

The conclusion that Mr. Lee draws from Judge Klein's decision in *Scoggins/Dry Mix Products Co.* is:

> As a result of this ruling, the stated policy of the Eastern District Bankruptcy Court became one that effectively limited trustee's compensation to no more than an amount equal to that being distributed to the unsecured creditors.

This statement by Mr. Lee is a misreading of Judge Klein's decision, the concurrence of the other active judges (including the current judge assigned this Bankruptcy Case), and the proper allowance of reasonable statutory commission fees for a trustee as provided for by Congress in 11 U.S.C. § 327 and § 330, which provides in § 330(a)(7), "In determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based on section 326." Congress has not statutorily created a limitation stating, "but the trustee may not receive more than is distributed to creditors holding general unsecured claims in a case."

One obvious reason for not creating such an artificial limitation on fees of the fiduciary of the Bankruptcy Estate is that there are acts that the trustee must take which are reasonable and necessary, but which may not equate to creating a dollar for dollar benefit for creditors holding general unsecured claims. Such limitation would prevent a trustee from pursuing claims that appear to have merit but are not "dead bang winners." It would also, as discussed above, create an incentive for those who choose to abuse the judicial system and law to promise a trustee to make it so expensive

17

1 to enforce the estate's rights, that the trustee and counsel will go unpaid since their reasonable fees

2 and compensation is artificially limited to that paid to general unsecured claims.

3     The contention is also contrary to the concurrence in *Scoggins* in which the other bankruptcy

4 judges in the Eastern District of California state:

5     Concur

6     MCMANUS, HOLMAN, LEE, BARDWIL, SARGIS, CLEMENT, Bankruptcy
    Judges, CONCURRING:

7

8     We CONCUR that this opinion demonstrates that there is an immediate need for a
    local bankruptcy rule requiring that chapter 7 trustees prepare, file, and notice for
9     hearing fee applications supported by time records and a narrative statement of
    services in the following circumstances:

10     (1) All requests seeking $10,000 or more;

11     (2) All cases in which the trustee seeks fees exceeding the amount remaining for
    unsecured priority and general claims;
12

13     (3) All cases involving a "carve out" or "short sale";

14     (4) All cases where the trustee operates a business; and

15     (5) Any case in which the court specifically orders such a fee application.

16     The rule will be prescribed by separate general order issued pursuant to 28 U.S.C. §
    2071(e) to have immediate effect, with notice and opportunity for comment provided
17     promptly thereafter.

18     The Clerk will hereafter provide the court with quarterly reports identifying total
    chapter 7 trustee compensation awards under 11 U.S.C. §§ 330(a) and 330(b) for each
19     chapter 7 trustee.

20     /s/ Michael S. McManus

21     MICHAEL S. McMANUS

22     /s/ Robert S. Bardwil

23     ROBERT S. BARDWIL

24     /s/ Thomas C. Holman

25     THOMAS C. HOLMAN

26     /s/ Ronald H. Sargis

27     RONALD H. SARGIS

28     /s/ W. Richard Lee

1   W. RICHARD LEE

2   /s/ Fredrick E. Clement

3   FREDRICK E. CLEMENT

4   *In re Scoggins*, 517 B.R. at 227-228. General Order 14-05, issued on December 11, 2014, adopts

5   the above provisions from the concurrence in *Scoggins*.

6          As the General Order provides, when Chapter 7 trustee fees (not attorney's fees) are going

7   to be more than $10,000.00, the trustee needs to provide additional information for the court to

8   consider the reasonableness of such fees. The General Order is pregnant with the inference that when

9   Chapter 7 fees in a case are $10,000.00 or less the concern over the reasonableness of such fees is

10  not so heightened and not an unexpected amount. Further, when the fees are more than $10,000.00,

11  then the Chapter 7 trustee must file a noticed motion (as was done in the case) for the allowance of

12  such fees.

13         Mr. Lee accurately states that in some bankruptcy cases, some trustees sought to have the

14  attorneys do trustee work, bill for it as attorney work, the attorney be paid for doing trustee work, and

15  the trustee pocket commission trustee fees without doing trustee work. To the extent that such

16  practices existed, that was in the past and, as the concurrence in *Scoggins* and General Order 14-05

17  demonstrate, as of 2014 all of the judges in this District were on-board with making certain such

18  former practices did not become reborn.

19         In his Reply and the Opposition, Mr. Lee does not identify what trustee work is alleged to

20  have been off-loaded for the attorney to do and bill for. Rather, he attacks based on the fees

21  exceeding the distribution to creditors holding general unsecured claims. He also asserts that the

22  trustees and trustee's counsel mishandled the Usury Action that the Debtor, with Mr. Weiner at the

23  helm, had started in State Court that should have been worth more than half a million dollars. Reply,

24  p. 8:15-23; Dckt. 424.

25         While making such contention, Mr. Lee provides little substance that there was such an easy

26  half-million dollar asset to just pick up. A review of the file in this case discloses that on July 2,

27  2019, Trustee Flemmer filed a Motion to Approve Compromise of the Usury Action (which Mr. Lee

28  states was started as a State Court Action to recover half-a-million dollars and removed from State

Court by Trustee Flemmer). Dckt. 277. The Motion to Approve Compromise was served on all parties in interest, including: (1) James Brunello, Esq., counsel for Debtor and counsel for former Debtor in Possession; (2) the Debtor; (3) Kopp Family Trust (sole shareholder of Debtor, with Mark Weiner, president of the Debtor, serving as trustee and being a beneficiary of the Kopp Trust); (4) Mark Weiner and Nancy Weiner (Mark Weiner's spouse, and co-trustee and co-beneficiary of the Kopp Family Trust); Adam Weiner, Esq., attorney in the State Court Action asserting the usury claim for Mark Weiner and Nancy Weiner (as the purported assignee of the usury claim); and (5) Mr. Lee. Cert. of Serv., Dckt. 281 at 6.

The Motion to Approve Compromise states with particularity the grounds upon which that relief is requested, including summary of the claims and rights asserted. It includes recitation of events, such as modifications of the loans to reduce the interest rates to below 10 percent, contentions that the Debtor had failed to make payments as purported, and that Debtor has sold collateral securing the loans and not paid the proceeds to the creditor that was the subject of the Usury Action. Motion to Approve Compromise, ¶ 12; Dckt. 277. The Motion to Approve the Compromise also includes a more detailed discussion than one commonly sees concerning the probability of success factor for consideration of such motions. *Id.*, p. 7:5-23. Additionally, Trustee Flemmer addresses in the Motion to Approve Compromise the universe of limited assets from which to recover any judgment obtained by the Trustee on the Usury Claim. *Id.*, p. 7:24-28.

No opposition by any party in interest, including Adam Weiner (usury litigation counsel for the Weiners), Mark Weiner, Nancy Weiner, James Brunello (counsel for the Debtor and former Debtor in Possession), or Mr. Lee, was filed to the Motion to Approve Compromise. Judge McManus, after conducting the noticed hearing on the Motion to Compromise, made findings of fact and conclusions of law that such compromise was proper as permitted in a bankruptcy case. Civil Minutes, Dckt. 282. The final order approving the compromise was filed on August 7, 2015. Dckt. 283.

Mr. Lee's assertion that the usury compromise was a "failure" by Trustee Flemmer and Trustee's Counsel is contrary to Judge McManus' findings and the final order approving that compromise.

At the end of the day, Mr. Lee hangs his contention on citation to statements in Judge Klein's *Scoggins* decision concerning there being a presumption, for Judge Klein, that if the fees for the trustee that exceed the distribution for the creditors, then the administration of the assets may have been primarily for the benefit of the trustee him or herself.

In reading Judge Klein's decision in *Scoggins*, one sees clearly that much of it goes to reconciling trends in other cases which routinely allow trustees maximum compensation in all cases, without regard to the trustee's actual services (or trustee services performed by trustee's counsel). Secondly, in addressing the nonbeneficial administration of assets just to generate fees, Judge Klein discussed the practice that had developed in some districts were trustees would sell overencumbered assets, recovering a carve out from the creditor's collateral just for the trustee and attorney's fees for selling the collateral for the benefit of the creditor.  *Scoggins*,517 B.R. at 222.  For one of the cases, the trustee was requesting maximum commission fees for a sale that "landed in the trustee's lap." *Id.* at 225.

**Trustee's Response**

On April 23, 2019, the Current Chapter 7 Trustee filed an Opposition to the Objection. Dckt. 421.  Trustee argues that Mr. Lee has not established that the Trustee's Final Report fails to meet the requirements of law.

Trustee argues further that Mr. Lee's objection to administrative fees in this case is untimely, as the various motions for compensation (Dckts. 378, 384, and 389) were set on 28 days' notice and pursuant to Local Bankruptcy Rule 9014(f)(1) a written opposition was required to be filed by March 21, 2019 (14 days prior to the hearing).  Trustee notes a timely appeal of those motions was required to be filed within 14 days (Fed. R. Bankr. P. 8002(a)(1)), and therefore those motions are final.

As addressed above, the court is considering the substance of Mr. Lee's Objections to the fees, and the final report as it includes such fees.

### DISCUSSION

This bankruptcy case was filed on June 8, 2012, as a voluntary Chapter 11 case for the Debtor corporation.  After the Debtor in Possession serving for eleven months, on April 24, 2013, the court

ordered the appointment of a Chapter 11 Trustee.  Order, Dckt. 131.   The findings of fact and conclusions of law by the court in determining that appointment of a Chapter 11 trustee was  proper include the following:

The court agrees with the movants that the debtor's principals, President Mark Weiner and Secretary Nancy Weiner, have serious conflicts of interest in managing the debtor's business and administering the debtor's estate for the benefit of the debtor's creditors. Mark and Nancy Weiner are also the trustors, trustees and beneficiaries of the revocable Kopp Family Trust, which is listed as the sole shareholder of the debtor. Docket 32, Amended SFA, question 21b; Ex. A to Motion at 67-68.

The majority of the debtor's income is generated from the management of six mobile home parks. Post-petition management income totals approximately $183,515, while post-petition sales of manufactured homes - the other major source of income for the debtor - totals approximately $76,928 plus a $29,000 promissory note. Motion at 8; Opposition at 2.

In addition to principals and shareholders of the debtor, via the trust the Weiners own 100% interest in two LLCs (Calaveras Valley Village LLC and Susanville Village LLC), which in turn own two of the mobile home parks the debtor is managing, one in Railroad Flat, California and the other in Susanville, California.

The debtor manages the Railroad Flat and Susanville parks pursuant to an oral agreement with the owners of the parks. As of the time this motion was filed, the debtor had reported to having collected management fees from the Railroad Flat park only for five of the last eight post-petition months and it had reported to having collected management fees from the Susanville park only for six of the last eight post-petition months.

Via their trust, the Weiners own 100% in two other entities, Park Village Corporation and Indian Villages Estates LLC, which in turn own 50% in one and 100% in another park.

Park Village Corporation owns 100% in Castle Village LLC, which in turn owns 50% interest in a park in Ione, California. The other 50% interest in that park is owned by an unrelated entity, Fujinaka Properties LP. Park Village Corporation owns also 70% in Redding Riverside Village LLC, which in turn owns 100% interest in a park in Redding, California. The other 30% of Redding Riverside Village LLC is owned by Indian Village Estate LLC.

The debtor manages the Redding park pursuant to an oral agreement with the owners of the park. The debtor manages the Ione park pursuant to a written agreement with the owners of the park. As of the time this motion was filed, the debtor had reported to having collected management fees from the two parks for all eight months of the post-petition period since the petition filing.

Via their trust, the Weiners own 50% in two other entities, Lassen West Village LLC and Forest Village LLC, which in turn own 100% in two other parks, in Forest Ranch, California and Westwood, California.

The other 50% interest in the Forest Ranch park is owned by Samuel Weiner, the son of the Weiners.  The other 50% interest in the Westwood park is owned by an unrelated entity, Burt Douglas Trust.

The debtor manages the Forest Ranch park pursuant to an oral agreement with the owners of the park. The debtor manages the Westwood park pursuant to a written agreement with the owners of the park.

As of the time this motion was filed, the debtor had reported to having collected management fees from the Forest Ranch park only for two of the last eight post-petition months and it had reported to having collected management fees from the Westwood park for all eight months of the post-petition period since the petition filing.

See Docket 88, Ex. B to Motion.

In addition to the foregoing, in June 2009, when the debtor found out about the movants' claims, it transferred, at the prompting of the Weiners, assets with a value of approximately $4.2 million, to the Weiners' revocable family trust. Those assets consisted of the debtor's 100% interest in the Castle Village LLC (valued at about $3 million at time of transfer) which owns 50% in the Ione park and the debtor's 70% interest in the Redding Riverside Village LLC (valued at about $1.2 million at time of transfer) which owns the Redding park.

The debtor did not receive any cash for the transfer of those assets. Instead, for the Castle Village LLC transfer, the trust assumed approximately $2 million debt the debtor owed to Union Bank and forgave $1 million in debt the debtor owed to the trust. Approximately $1.9 million of the Union Bank claim is still outstanding. As to the Redding Riverside Village LLC transfer, the trust assumed approximately $1.3 million in debt for the debtor. $1.06 million of this debt is still outstanding. None of the creditors whose debt was assumed by the trust released the debtor from liability when the trust assumed the debt. Ex. A to Motion at 70-77.

The bankruptcy schedules reflect that the debtor's real property assets have a value of $80,000 and its personal property assets have a value of $761,673. Schedule D lists $840,925 of secured claims, Schedule E lists $6,766 in priority claims, and Schedule F lists $4,107,745 of general unsecured claims, approximately $2.07 million of which are represented by a note payable to the Weiners' trust. Dockets 26 and 50.

Notably, while the court does not know the identity of the creditor(s) holding the still outstanding $1.06 million claim assumed by the trust, the still outstanding approximately $1.9 million claim of Union Bank is not listed in the debtor's schedules. See Docket 50, Amended Schedule F.

The court also notes that the debtor has generated more management fees from the Ione and Redding parks than from any of the other parks. From the Ione park, the debtor has reported generating approximately $98,083 in post-petition management fees. From the Redding park, the debtor has reported generating approximately $55,241 in post-petition management fees. The third most-profitable park is the Westwood park, with only approximately $19,313 in post-petition management fees. Motion at 8.

The appointment of a trustee is in the best interest of the estate's creditors. The Weiners have a substantial conflict of interest in operating the debtor's business, given that they own and control the businesses from which the debtor generates revenue. This conflict is not merely a potential conflict, it is an actual conflict of interest.

The Weiners' pre-petition transfer of $4.2 million in debtor assets to the debtor's 100% shareholder, a trust controlled and owned solely by the Weiners, without the debtor

receiving consideration, except for the assumption of still unpaid debt in the amount of nearly $3 million ($1.9 million owed to Union Bank plus $1.06 million other debt) and the forgiveness of unidentified debt of approximately $1 million owed to the trust, indicates to the court that the Weiners have no regard for the debtor's creditors.

The Weiners transferred 83% or $4.2 million of the debtor's $5.041 million in pre-transfer assets to themselves and promised to pay over $3 million in debt for the debtor by assuming it, but they did not pay it despite collecting the profits generated from the transferred mobile home parks.

More, after the Weiners received the transfer of the debtor's interest in the Ione and Redding parks, the Weiners' once again transferred that interest in the parks to other entities, Park Village Corporation and Indian Villages Estates LLC. See Ex. B to Motion.

The timing of the transfers is highly suspect as they occurred in the same month and year the debtor was apprised of the movants' claims, June 2009. Although the court cannot decide whether, as the debtor contends, the transfer was beneficial to the debtor, the terms and timing of the transfer raise serious questions about the Weiners' regard for the debtor's creditors, i.e., whether they are conducting the debtor's affairs and administering the debtor's bankruptcy estate with the interest of the debtor's creditors in mind.
. . .
The debtor has decided not to pursue avoidance of the transfer. Instead, the debtor is proposing to provide its creditors with opportunity to evaluate avoidance of the transfer and seek court permission to prosecute it. But, this does not justify the debtor's unwillingness to prosecute avoidance of the transfer, when, as demonstrated below, the debtor has not evaluated avoidance of the transfer fairly and adequately.

The opposition says that the transfer was beneficial to the debtor at the time it was made. Yet, the opposition offers no facts to support such a conclusion. The facts in the record could easily support a conclusion to the contrary. The debtor has not been released from the debt assumed by the trust and Mr. Weiner has admitted that most of that debt is still outstanding, while the opposition says nothing about the profits from the Ione and Redding parks from June 2009 until today. One possible scenario is that the Weiners have not been using the profits from the two parks to pay the debt they assumed in the June 2009 transfer, forcing the administration of such debt in this case.

In addition, the opposition says nothing about the purported $1 million claim of the Weiners against the debtor, allegedly forgiven in the 2009 transfer. There may have never been a basis for that claim.

The opposition also ignores the possibility that, if there is a successful avoidance action, the debtor may recover the property transferred or the value of such property, including the profits generated by the transferred parks from June 2009 until today. The opposition does not factor this into its contention that avoidance of the transfer is not in the best interest of the estate. The court does not have evidence about the profitability of the transferred Ione and Redding parks since the 2009 transfer. The opposition makes no effort to address this issue. The court cannot conclude that the 2009 transfer was indeed beneficial to the debtor when it was made and that avoiding the transfer today would not be beneficial to the debtor's estate and creditors.

The court rejects the debtor's assessment of avoidance of the transfer, concluding that the Weiners cannot continue to manage the debtor while carrying out the debtor's

fiduciary obligations as a trustee to the estate and creditors of the estate.

In connection with the debtor's advocation that the Weiners should continue to manage its affairs and administer this estate, the court reminds the debtor's counsel that he represents the debtor as a debtor in possession, in charge of the debtor's bankruptcy estate, an entity with fiduciary obligations to its creditors that is separate and distinct from the debtor, the Weiners and their other entities. He does not represent the debtor aside from the estate, and does not represent the Weiners, their trust, or other entities. Thus, he must advance solely the estate's best interests. "[T]he debtor in possession has the same fiduciary duties and liabilities as a Trustee. When the debtor is a corporation, corporate officers and directors are considered to be fiduciaries both to the corporate debtor in possession and to the creditors." *Holta v. Zurbetz (In re Anchorage Nautical Tours, Inc.)*, 145 B.R. 637, 643 (B.A.P. 9th Cir. 1992); see also 11 U.S.C. § 1107(a).

The Weiners' conflict of interest is further bolstered by the failure of three of their parks to pay all post-petition management fees to the debtor. According to the motion, three of the parks have not been paying management fees to the debtor regularly. As noted above, as of the time this motion was filed, the debtor had reported to having collected management fees from the Railroad Flat park only for five of the last eight post-petition months, it had reported to having collected management fees from the Susanville park only for six of the last eight post-petition months, and it had reported to having collected management fees from the Forest Ranch park only for two of the last eight post-petition months. This is concerning especially because the Weiners own 100% interest in the Railroad Flat and Susanville parks and 50% interest in the Forest Ranch park, with the other 50% owned by the Weiners' son, Samuel Weiner.

The opposition does not address the missing management fee payments. It focuses solely on the park management fee rates. Opposition at 3-4. Because of opposition's failure to address the missing payments issue, the court concludes that the Weiners are not disputing the missing management fee payments as identified by the motion. From the missing management fee payments, the court infers that the Weiners have no intention of honoring all contracts with the debtor, via their trust and/or other entities, including their interests in the Railroad Flat, Susanville, and Forest Ranch parks. This is another manifestation of the Weiners' actual conflict of interest in failing to enforce the debtor's management fee agreements with the Weiners' other entities.

Civil Minutes, Dckt. 130.

Then, on September 5, 2013, the court ordered the case converted to one under Chapter 7. Order, Dckt. 188. In addition to reviewing the prior history of the Debtor and Mark Weiner (Debtor's president) in this case, the court concluded that the Debtor's principal, Mark Weiner, could not be trusted on his promise to make "a substantial cash contribution," which was offered to derail the conversion to Chapter 7. Civil Minutes, Dckt. 187 at 3. Additionally, Judge McManus noted that Mr. Weiner had failed to provide such funding for 11 months while the Debtor in Possession was in control of the case, *Id.*, or even after in working on a plan with the Chapter 11 Trustee.

The detailed findings and conclusions of the judge to whom this case was previously assigned

25

clearly show that this was not a "simple Chapter 7 liquidation," but one in which the trustee and trustee's counsel would face major challenges. These challenges included multiple and multi-tiered related and overlapping interests and conflicts between the Debtor, its principals, asserted creditors, and entities with which the Debtor, and then Bankruptcy Estate did business.

It also runs counter to Mr. Lee's assertion that if the judge had just left the Debtor and Mark Weiner in control, everything would have been fine for creditor's with general unsecured claims. Judge McManus was convinced otherwise, and there is nothing in the record showing that Judge McManus was incorrect.

A review of the file in this case shows that Judge McManus' concerns were not limited to just the above, but on at least two occasions he called out counsel for the Debtor in Possession, reminding him that he represented the fiduciary debtor in possession, and not the Debtor or Mr. Weiner.[10] Such reference is indicative of the Debtor in Possession and counsel for the Debtor in Possession acting for the personal interests of the Debtor and its principals, and not in its fiduciary capacity for the Bankruptcy Estate in lieu of there being a Chapter 11 trustee.

### REVIEW OF APPLICATIONS FOR COMPENSATION

On March 6, 2019, three applications for approval of compensation were filed seeking approval of (1) $77,524.58 in fees and $7,029.82 in expenses for Desmond, Nolan, Livaich, and Cunningham; (2) $6,613.06 in fees for Current Chapter 7 Trustee; (3) $12,837.12 in fees and $57.00 in expenses for Trustee Flemmer; and (4) $8,140.00 in fees and $21.00 in expenses for Gonzalez & Associates, Inc., fka Gonzales & Sisto, LLP. Dckts. 378, 384, and 389.

Each of those applications were set for hearing on 28 days' notice. Dckts. 379, 385, and 390. Each motion was served properly on Mr. Lee. Dckts. 383, 388, 394. Local Bankruptcy Rule 9014(f)(1) required a written opposition to be filed by March 21, 2019 (14 days prior to the hearing).

At the April 4, 2019 hearing on each application, the court found that notice was properly provided and that the fees requested were reasonable in light of the services performed in the case. Dckts. 406-408. The court subsequently issued an Order granting each application and awarded the

---

[10] Civil Minutes, Dckt. 130 at 4; Civil Minutes, Dckt. 187 at 2.

1   requested fees and expenses. Dckts. 410-412.

2

**Compensation for Former Chapter 11 Trustee and**
3   **Chapter 7 Trustee David Flemmer, and For Current Chapter 7 Trustee**

4           In considering the requested fees and ruling after the April 4, 2019 hearing, the court

5   addressed the legal framework set out in 11 U.S.C. § 330(a)(3) and § 326, as further grounded in

6   Eastern District of California General Order 14-05 in ruling on the Application to Approve

7   Compensation for the two trustees.  In determining the amount of reasonable compensation to be

8   awarded to an examiner, trustee under chapter 11, or professional person, the court shall consider the

9   nature, the extent, and the value of such services, taking into account all relevant factors, including—

10              (A) the time spent on such services;

11              (B) the rates charged for such services;

12              (C) whether the services were necessary to the administration of, or beneficial
                at the time at which the service was rendered toward the completion of, a case under
13              this title;

14              (D) whether the services were performed within a reasonable amount of time
                commensurate with the complexity, importance, and nature of the problem, issue, or
15              task addressed;

16              (E) with respect to a professional person, whether the person is board certified
                or otherwise has demonstrated skill and experience in the bankruptcy field; and
17

18              (F) whether the compensation is reasonable based on the customary
                compensation charged by comparably skilled practitioners in cases other than cases
                under this title.
19

20   Further, the court shall not allow compensation for,

21        (i) unnecessary duplication of services; or

22        (ii) services that were not—

23              (I) reasonably likely to benefit the debtor's estate;

24              (II) necessary to the administration of the case.

25   11 U.S.C. § 330(a)(4)(A).  A professional must "demonstrate only that the services were reasonably

26   likely to benefit the estate at the time rendered," not that the services resulted in actual, compensable,

27   material benefits to the estate. *Ferrette & Slatter v. United States Tr. (In re Garcia)*, 335 B.R. 717,

28   724 (B.A.P. 9th Cir. 2005) (citing *Roberts, Sheridan & Kotel, P.C. v. Bergen Brunswig Drug Co. (In*

The court does not concur in Mr. Lee's conclusions that the six-plus year administration of this case and properties sold were done as a billing scheme to manufacture compensation for the trustees. Rather, it represents modest, delayed compensation for trustees administering a case with significant complexities over six years that spanned two Chapters of the Bankruptcy Code.

The aggregate trustee fees for both the Chapter 11 and Chapter 7 phases of this case total $19,450.18 ($12,837.12 for Trustee Flemmer and $6,613.06 in fees for Current Chapter 7 Trustee). As further set forth in the Trustee's Final Report there is $54,864.07 for disbursement to creditors holding general unsecured claims. That amount available for disbursement to creditors with general unsecured claims is three times the total trustee fees for two trustees in this case, which proceedings have included the services of a Chapter 11 trustee.

Mr. Lee does not direct the court to trustee work that is purported to have been offloaded to the Trustees' Counsel for which compensation is sought by the trustees in this case. Rather, he forcefully argues that the work done by various professionals and other administrative expenses (such as taxes, bank fees, accountant services, and the like) exceed the distribution to creditors holding general unsecured claims. The court considers when fees requested by trustees' counsel are reasonable and necessary in connection with the counsel's fee application. The court has also considered, and carefully reviewed the file in this case, whether either of the two trustees, not merely Trustee Flemmer, just turned Trustees' Counsel loose to run up bills for unnecessary legal work for counsel's own benefit or had counsel do the trustees' work. The court concludes "no" on both counts.

For Trustee Flemmer, spreading $12,837.12 in fees over a six year period is not a "big payday." It is not indicative of a trustee manipulating a case to generate monies for the trustee at the expense of creditors. To the contrary, it indicates a trustee working to generate whatever he can for the Bankruptcy Estate, and not just giving in when faced with opposition.

Second, the sales generated significant benefit for creditors holding general unsecured claims.

///

///

29

It generated the monies to be paid creditors with general unsecured claims.[11] For the sales that generated payments to Textron on its secured claims and lesser monies for the Bankruptcy Estate, it appears that such sales kept Textron's unsecured claim at ($28,423.74), with Textron not amending its proof of claim to assert an additional unsecured claim amount.

Using the currently stated $54,864.07 of funds proposed to be disbursed to general unsecured claims, with general unsecured claims of ($1,707,285.98), the projected dividend is 3.21%.

If the general unsecured claims were increased to ($2,029,906.85), including the amount of the unsecured portion of the filed secured claim if Textron had amended its proof of claim for the entire shortfall, the dividend drops to 2.7%, a (15.9%) reduction. For creditor Robert Orrison, who holds the largest general unsecured claim of ($354,353.32), that reduction would have cost him alone ($1,807.20). For the general unsecured creditor body as a whole, it would have cost them collectively ($8,707.15) just for the additional unsecured claim of Textron.

On top of that, if Trustee Flemmer had not administered properties for which payments were made on Textron's secured claim, the Bankruptcy Estate would have lost $18,000.00 in proceeds further depressing the recovery for creditor's holding general unsecured claims as each dollar lost necessarily reduces the monies available to creditors holding general unsecured claims. That would have left only $35,916.04 for creditors holding general unsecured claims, reducing their dividend to 2.1%, a 35% reduction from the 3.21% dividend based on ($1,707,285.98) in general unsecured claims (or down to 1.7% if Textron asserted the larger unsecured claim).

The total Chapter 11 and Chapter 7 trustee fees for Trustee Flemmer are only $12,837.12, less than the monies generated from just those sales of assets encumbered by the Textron lien (and not taking into account the proceeds from other sales, other income, and the usury claim compromise).

In contrast to the *Scoggins* situation addressed by Judge Klein where a trustee works only to generate monies for creditors with secured claims, has a simple sale dropped in his or her lap that

---

[11] The file in this case reflects that all of the sale motions were simple to prosecute, simple in form, and for which there was no opposition from any party in interest.

1  requires no significant work, or has his or her attorney administer the sale of property of the estate
2  and then such trustee seeks to rake off the money for doing nothing for the estate, over the six trustee
3  years in this bankruptcy case the two trustees had to actively administer a complex case.

4          While Mr. Lee asserts that the trustees milked the case and if the Debtor and Mr. Weiner had
5  been left in charge all would have been well for little cost, the facts do not bear that out.  The Debtor
6  and Mr. Weiner, serving as the president of the Debtor, were not able to prosecute this bankruptcy
7  case.  They could not advance a plan as the Debtor in Possession.  They could not advance a plan in
8  the Chapter 11 case after a trustee was appointed.  Mr. Weiner, as the trustee of the Kopp Family
9  Trust (which is the stated sole shareholder of the Debtor and for which Mr. Weiner and his spouse
10 are the beneficiaries), asserted an ($1,831,995.73), Proof of Claim No. 36-1 (filed on October 15,
11 2014, after the case was converted to one under Chapter 7),[12] for which no documentation was filed
12 with the proof of claim, and for which no effort was made to defend when the Current Chapter 7
13 Trustee objected to the Proof of Claim based on lack of documentation.

14         The Debtor and its principals saddled Trustee Flemmer with having to address the Usury
15 Action and possible claims arising out of the financing structured by Debtor and its principals pre-
16 petition.  While Mr. Lee asserts that the settlement was mishandled and the recovery woefully low,
17 nobody (including Mr. Lee, Mark Weiner, Adam Weiner, or Mr. Brunello) objected.  More
18 significantly, the Debtor, Mr. Weiner as president of the Debtor, and Adam Weiner as counsel for
19 Mr. Weiner (who purported to be an assignee of such usury claim rights) had not successfully
20 prosecuted such claim to recovery.  Additionally, they presented no opposition to, nor provided Judge

21  _____

22         [12]  The Debtor, with Mr. Weiner as president signing the Schedules under penalty of
23 perjury, listed the Kopp Family Trust as having an undisputed, noncontingent, liquidated general
   unsecured claim of $2,070,023.00 on Schedule F.  Dckt. 26 at 22.  Being undisputed,
24 noncontingent, and liquidated as stated under penalty of perjury on the Schedules, the claim was
   deemed allowed and no proof of claim was required.  11 U.S.C. § 1111(a).  A proof of claim was
25 required only when the case was converted to one under Chapter 7.  11 U.S.C. § 502, 1111(a).

26         In reviewing Schedule F, the court notes that the Schedule, signed under penalty of
27 perjury by Mr. Weiner, states that the obligation based on a "note payable."  No note was
   attached to Proof of Claim No. 36-1 and none was presented when the Current Chapter 7 Trustee
28 objected to that proof of claim.

1    McManus with any evidence, information, or argument, that the compromise of the usury claim rights

2    was not property or not in the best interests of the Bankruptcy Estate.

3          The trustee's fees of $12,837.12 to David Flemmer as the former Chapter 11 trustee and the

4    former Chapter 7 trustee over a four-year period (May 2013 through January 2017) are reasonable

5    compensation pursuant to 11 U.S.C. § 326 and § 330 for Trustee Flemmer.  Mr. Lee has not presented

6    the court with any basis for not allowing all or any portion of said fees that were requested in the

7    Application (DCN: DNL-24) filed with this court. Application, Dckt. 384.

8          Though not objected to by Mr. Lee, the fees for the Current Chapter 7 Trustee of $6,613.06

9    is fair and proper compensation for her services as the Chapter 7 trustee after Trustee Flemmer's

10   passing.

11         The compensation for both Trustee Flemmer and the Current Chapter 7 Trustee are correctly

12   computed based on $324,003.53 on "moneys disbursed or turned over in the case by the trustee to

13   parties in interest, excluding the debtor, but including holders of secured claims." 11 U.S.C. § 326(a).

14   The $125,100.00 disbursed to Textron on its secured claim not only generated monies for the

15   Bankruptcy Estate of $18,948.00, but Textron did not increase its unsecured claim for any other

16   amounts of the filed secured claim that went unpaid as a secured claim.

17         The Objection as to the fees and costs of Trustee Flemmer is overruled.  The fees and costs

18   having been awarded Trustee Flemmer and the Current Chapter 7 Trustee pursuant to the Order of

19   the Court (Dckt. 412), no further order of the court thereon is required.

20   **Compensation for Counsel for the Trustee**

21         Mr. Lee also asserts that the Desmond, Noland, Livaich & Cunningham law firm has

22   requested unreasonable compensation, it's attorneys having worked on unnecessary matters

23   prosecuting the case for its own benefit and not for the Bankruptcy Estate.  This contention goes

24   hand-in-hand with Mr. Lee's contention that Trustee Flemmer mismanaged the Bankruptcy Estate.

25         The fees requested by Trustees' Counsel total ($77,524.58) and ($7,029.82) in expenses for

26   six years  (May 2013 through May 2019).  Of these fees, ($30,589.58) is for the contingent fees for

27   services rendered in connection with the usury claim recovery.  The remaining ($46,935.00) is for

28   other services rendered Trustee Flemmer as the Chapter 11 and Chapter 7 Trustee and the Current

32

1  Chapter 7 Trustee.

2        As set forth in the Civil Minutes from the hearing on the Application for Compensation of
3  trustees' counsel, the court applied similar factors as discussed above for the bankruptcy trustees.
4  Civil Minutes, Dckt. 406.  As discussed in that ruling, rather than a "commission" based analysis of
5  fees for counsel, when there is not a contingent fee authorized by the court, for bankruptcy cases in
6  the Ninth Circuit, "the primary method" to determine whether a fee is reasonable is by using the
7  lodestar analysis. *Marguiles Law Firm, APLC v. Placide (In re Placide)*, 459 B.R. 64, 73 (B.A.P. 9th
8  Cir. 2011) (citing *Yermakov v. Fitzsimmons (In re Yermakov)*, 718 F.2d 1465, 1471 (9th Cir. 1983)).
9  The lodestar analysis involves "multiplying the number of hours reasonably expended by a
10 reasonable hourly rate." *Id.* (citing *In re Yermakov*, 718 F.2d at 1471).  Both the Ninth Circuit and
11 the Bankruptcy Appellate Panel have stated that departure from the lodestar analysis can be
12 appropriate, however. *See id.* (citing *Unsecured Creditors' Comm. v. Puget Sound Plywood, Inc. (In
13 re Puget Sound Plywood)*, 924 F.2d 955, 960, 961 (9th Cir. 1991) (holding that the lodestar analysis
14 is not mandated in all cases, thus allowing a court to employ alternative approaches when
15 appropriate); *Digesti & Peck v. Kitchen Factors, Inc. (In re Kitchen Factors, Inc.)*, 143 B.R. 560, 562
16 (B.A.P. 9th Cir. 1992) (stating that lodestar analysis is the primary method, but it is not the exclusive
17 method)).

18        The court also considered, and now re-reviews in light of Mr. Lee's Objection, whether such
19 services are both reasonable and necessary.  Even if the court finds that the services billed by an
20 attorney are "actual," meaning that the fee application reflects time entries properly charged for
21 services, the attorney must demonstrate still that the work performed was necessary and reasonable.
22 *In re Puget Sound Plywood*, 924 F.2d at 958.  An attorney must exercise good billing judgment with
23 regard to the services provided because the court's authorization to employ an attorney to work in
24 a bankruptcy case does not give that attorney "free reign to run up a [professional fees and expenses]
25 tab without considering the maximum probable recovery," as opposed to a possible recovery. *Id.*; *see
26 also Brosio v. Deutsche Bank Nat'l Tr. Co. (In re Brosio)*, 505 B.R. 903, 913 n.7 (B.A.P. 9th Cir.
27 2014) ("Billing judgment is mandatory.").  According to the Court of Appeals for the Ninth Circuit,
28 prior to working on a legal matter, the attorney, or other professional as appropriate, is obligated to

33

consider:

> (a) Is the burden of the probable cost of legal [or other professional] services disproportionately large in relation to the size of the estate and maximum probable recovery?
>
> (b) To what extent will the estate suffer if the services are not rendered?
>
> (c) To what extent may the estate benefit if the services are rendered and what is the likelihood of the disputed issues being resolved successfully?

*In re Puget Sound Plywood*, 924 F.2d at 958–59 (citing *In re Wildman*, 72 B.R. 700, 707 (N.D. Ill. 1987)).

A review of the application shows that Applicant's services for the Estate include general case administration; asset analysis, recovery, and disposition; claims administration and objections; and applications for employment and fees.

The Estate has $185,192.64 of unencumbered monies, after payment of secured claims, to be administered as of the filing of the application. Mr. Lee complains that some of that money, what he considers to be a disproportionate amount, has to go to pay administrative expenses (including trustees' and counsel's fees) of $130,185.21.

Mr. Lee's conclusion that Judge Klein's analysis in *Scoggins* all but mandates determining that Trustees' Counsel fees are unreasonable when the administrative expenses exceed the distribution to creditors holding secured claims is incorrect. The *Scoggins* decision addressed trustee fees. It does include an analysis of whether a trustee is seeking to offload his or her work on an attorney and make a bankruptcy estate double pay for the services. The court in *Scoggins* was not addressing compensation for the attorney for a trustee, though there is reference to trustees and attorneys not shifting trustee work to attorneys so the trustee can "double bill" for work not done by the trustee. The court considers such issue in determining whether the services performed by the attorney were both reasonable and necessary services of an attorney, doing the work of an attorney.

As discussed by this court in the Civil Minutes from the hearing on Trustees' Counsel's fee Application, Counsel provides a task billing analysis and supporting evidence for the services provided, which are described in the following main categories.

> <u>General Case Administration:</u> Applicant [trustees' Counsel] spent 34.7 hours

in this category. Applicant performed services related to the administration of the bankruptcy case, including review of Debtor's filing documents; communicating with and advising the current and former trustee regarding claims against and administration of administering the estate; and preparation of the opposition and attendance of the hearing on the motion to convert the Debtor's case from Chapter 11 to Chapter 7.

Efforts to Assess and Recover Property of the Estate: Applicant spent 84.6 hours in this category. Applicant performed asset investigation for the former trustee, communicated with the former trustee regarding issues related to asset disposition, and prepared multiple motions, and attended the hearings, for approval of sale of estate assets.

Claims Administration and Objections: Applicant spent 27.7 hours in this category. Applicant prepared a motion to pay administrative taxes; reviewed, prepared objections to, and communicated with the trustee regarding the proofs of claim; and prepared the motion for allowance of administrative claims.

Fee/Employment Application: Applicant spent 52.6 hours in this category. Applicant prepared several applications to employ professionals of the estate, as well as fee applications.

Civil Minutes, Dckt. 406. The dollar breakdown of the fees for this non-contingent fee portion of the fees requested is:

| Category | Hours Billed | Total |
|---|---|---|
| Case Administration | 34.7 | $10,572.00 |
| Asset Analysis, Recovery, and Disposition | 84.6 | $21,095.00 |
| Claims Administration and Objections | 27 .7 | $6,330.00 |
| Fee/Employment Applications | 52 .6 | $8,937.50 |
| TOTAL | 199 .6 | $46,935 .00 |

The court's analysis in the above referenced Civil Minutes includes the loadstar analysis computed by Counsel multiplying the time expended providing the services multiplied by an hourly billing rate.

The persons providing the services, the time for which compensation is requested, and the hourly rates are:

| Names of Professionals and Experience | Time | Hourly Rate | Total Fees Computed Based on Time and Hourly Rate |
|---|---|---|---|

35

| | | | |
|---|---|---|---|
| J. Russell Cunningham | 27.9 | $375.00/ $400.00/ $425.00 | $11,142.50 |
| J. Luke Hendrix | 66.7 | $225.00/ $275.00/ $325.00 | $20,347.50 |
| Nicholas L. Kohlmeyer | 14.5 | $200.00/ $225.00 | $3,175.00 |
| Ryan J. Ivanusich | 38.9 | $175.00 | $6,807.50 |
| Gabriel P. Herrera | 9.2 | $175.00 | $1,610.00 |
| Nabeel Zuberi | 33.1 | $75.00/ $150.00/ $175.00 | $2,847.50 |
| Anne Badasci | 7.8 | $100.00/ $175.00 | $930.00 |
| Courier | 1.5 | $50.00 | $75.00 |
| **Total Hourly Fees for Period of Application** | | | $46,935.00 |

*Id.*

The court concluded at the prior hearing, and again upon considering this again anew based on the Objection by Mr. Lee, that the fees, both the contingent fee not objected to and the hourly fees and costs, are for reasonable and necessary services of an attorney, which were billed at a reasonable hourly rate for the services provided and the time billed for the services were reasonable and necessary.

As part of this analysis the court reviewed, and now re-reviewed in light of Mr. Lee's Objection, the Detailed Billings included as Exhibit E, Dckt. 382 at 16-50. These fees are listed by person billing for services. These billings are for legal services provided, not for "trustee work."

In considering the dollar amount of fees as they relate to the monies generated in this case, after subtracting out the $90,000.00 amount for the compromise for which the contingent fee is based, that leaves the estate with $254,000.25 in monies generated. The legal fees requested are 18% of the assets generated. Not an unusually high percentage of legal services to money in play.

These fees span the period from May 5, 2013 though March 4, 2019 - a six-year period. This averages $7,822.50 a year, for which the payment has been substantially delayed. This modest

1  amount of attorney's fees on an annual basis is not indicative of attorneys actively churning a file.

2       Contrary to Mr. Lee's belief that there is a commonplace abuse of the bankruptcy laws and

3  federal judicial proceedings by Chapter 7 trustee's and their attorneys, such is not the case in this

4  District. The trustees know that the judges do not just routinely sign off on whatever fees are sought.

5  Additionally, there is no "only what the creditors get is what the trustee and professionals can be

6  paid" rule that exists.  Such would encourage persons who seek to engage in non-productive,

7  baseless, litigation to drive up the costs that trustees and their professionals have to capitulate to such

8  "professional litigators."  Also, the court does not ignore secured claims and those creditors, slaving

9  trustees and professionals of the bankruptcy to the "ship of the unsecured claims."

10      The trustees and professionals do not guaranty any specific recovery for any party.  Here,

11  while Mr. Lee has a very small return on his very, very, very small claim (00.35% of the total

12  unsecured claims), it is a function of his very, very, very small percentage of the total general

13  unsecured claims.  Even if there was an additional $20,000.00 for unsecured claims, Mr. Lee would

14  receive only an additional $70.00 - nothing more meaningful by virtue of the amount of his claim.

15      The court finds that the hourly rates are reasonable and that Applicant effectively used

16  appropriate rates for the services provided.  First and Final Fees in the amount of $46,935.00 for

17  hourly billings, $30,589.58 in contingent fees, and $7,029.82 in costs were approved pursuant to

18  11 U.S.C. § 330 and Mr. Lee's Objection does not provide a basis for changing that result even

19  considering such fees and costs anew for purposes of this Objection.

20      The Objection to the Fees and Costs for Trustees' Counsel is overruled.  Such fees and costs

21  having been awarded pursuant to the Order of the Court (Dckt. 410), no further order of the court

22  thereon is required.

23              **MR. LEE'S ASSERTION THAT THE DEBTOR AND**
                **MR. WEINER PROSECUTING THE CASE WOULD HAVE**
24              **EASILY YIELDED SUPERIOR  RESULTS IS NOT PERSUASIVE**

25      One of Mr. Lee's main themes in his Objection is that the Debtor and its principal, Mark

26  Weiner, should have been left in control to run the bankruptcy show.  Much of Mr. Lee's

27  consternation is built around his belief that the Debtor and Mr. Weiner, if they had just been allowed

28  to stay in control, would have "saved the creditors."  In his Objection Mr. Lee argues:

                                        37

1

2          The unsecured creditors, including LEE, have been the victims of these unreasonable
           fees and costs that comprise approximately two-thirds of the estate funds collected by
3          the prior and current Chapter 7 Trustees. Had the Chapter 11 proceeding simply been
           allowed to continue more than five (5) years ago, rather than be converted, these
4          unsecured creditors would have been paid far closer to the value of their claims rather
           than the 3.2% that they are now being forced to accept.

5    Objection, p. 2: 19-24; Dckt. 400.  The triggering event for the Debtor's loss of control more than

6    five years ago in 2013 was not the conversion of the case to Chapter 7, but the appointment of a

7    Chapter 11 trustee for cause by order filed on April 24, 2013. Dckt. 131.  As Judge McManus made

8    clear in his ruling, the appointment of a trustee was required for multiple reasons, not only the

9    conflict that existed with respect to a transfer made from the Debtor to the principals who are in

10   control of the Debtor, but the principals failing to recover management fees from other related entities

11   they controlled.

12          One thing that Mr. Lee does not disclose in the Objection is that he is a business associate and

13   ally of Mark Weiner in other business ventures for which bankruptcy cases have been filed, litigation

14   pursued, and attorney's fees and costs awarded (for which judgments and orders have been entered

15   against Mr. Lee and Mr. Weiner's entities).  These include: *Lee v. Gold Strike Heights Association*

16   *et al*, Adv. 15-9062 (judgment and attorney's fees against Mr. Lee affirmed on appeal); *Gold Strike*

17   *Heights Homeowners Association*, 15-90811; *Indian Village Estates v. Gold strike Heights*

18   *Association*, Adv. 15-9061 (judgment against Indian Village Estates, a Mark Weiner entity in which

19   Mr. Lee was closely involved), affirmed on appeal.  For his claim in this case, Mr. Lee's engagement

20   letter filed in support of said claim, states that Mark Weiner, as president of the Debtor, was engaging

21   the services of Mr. Lee to: (1) interview witnesses, (2) prepare documents for the trial attorneys,

22   (3) prepare trial exhibits, and (4) assist the trial attorney with "administrative tasks" at the

23   February 27, 2012 San Bernardino trial.  Proof of Claim No. 34-1, p. 4.  This business affiliation with

24   Mark Weiner may explain why Mr. Lee  believes that the trustees  who took over this case when

25   Judge McManus concluded that Mark Weiner had disqualifying conflicts did not handle it the way

26   Mr. Weiner would have.

27          This case was a long slog for the Trustee Flemmer and the Current Chapter 7 Trustee.  For

28   the Trustee Flemmer who has caught Mr. Lee's ire, there is only $12,837.12 for his portion of the

1  maximum compensation that could be awarded.  Mr. Lee has not provided the court with any credible

2  basis to conclude that such fees are unreasonable for a Chapter 11 trustee and Chapter 7 trustee over

3  a four year period (May 2013 - February 2017).

4        This judge does not concur with Mr. Lee's assertion that all would have been well if Judge

5  McManus had not addressed and ruled on the disqualifying conflicts for Mr. Weiner and associates.

6  The court does not agree that Judge McManus was misled to improperly convert this case to one

7  under Chapter 7.  In concluding conversion was proper, Judge McManus' findings and conclusions

8  include:

9      The debtor opposes the motion, stating that the debtor's "principal is prepared to fund
10     a plan with a substantial cash contribution and requests the opportunity to do so."
       Docket 178 at 6.
       . . .
11     The declaration of the debtor's principal filed in opposition to the motion, offering to
       fund a plan with a substantial cash contribution, is not helpful in persuading the court
12     that chapter 11 reorganization is viable.
       . . .
13     The income the debtor generates is barely sufficient to pay only the debtor's ten
       employees, let alone paying the debtor's manager (also known as the debtor's
14     principal), professionals and ultimately creditors. Docket 167 at 2.

15     The declaration of the debtor's principal filed in opposition to the motion, offering to
       fund a plan with a substantial cash contribution, is not helpful in persuading the court
16     that chapter 11 reorganization is viable.

17     First, the court reminds the debtor's counsel, James Brunello, who filed the
       declaration in opposition to the motion, that he was retained to represent the debtor's
18     bankruptcy estate. He was not retained to represent the debtor, aside from the entity
       charged to administer the bankruptcy estate, or the debtor's principal.
19
     Second, the court appointed a chapter 11 trustee precisely because it found that the
20     debtor's principal had a serious conflict of interest in administering the debtor's
       bankruptcy estate.
21     . . .
       Given the foregoing, the court is not convinced that the debtor's principal can be
22     trusted on his promise to make "a substantial cash contribution."

23     Third, even if this court had not concluded that the debtor's principal has a conflict of
       interest in administering the debtor's estate, the debtor's principal had the opportunity
24     to make a cash contribution to fund a plan in this case for approximately 11 months
       prior to the appointment of the chapter 11 trustee. This case was filed on June 8, 2012.
25     The motion for the appointment of the chapter 11 trustee was heard on April 19, 2013.
       The order appointing the trustee was entered on April 24, 2013. Dockets 130 & 131.
26
     Finally, the debtor's principal will not be deprived of the opportunity of making a cash
27     contribution to the debtor's estate to pay creditors, if the case is converted to
       chapter 7. A chapter 7 trustee may seek substantive consolidation of the assets and
28     liabilities of the debtor and the debtor's principal.

1  Civil Minutes, Dckt. 187.

2       While Mr. Lee now believes that he and other creditors like him would be better off if there

3  was not a trustee exercising the rights and powers for the Bankruptcy Estate, such is not borne out

4  by the record in this case.  Though the Debtor and Mr. Weiner, along with Mr. Lee and other

5  purported allied creditors with the Debtor, had the opportunity to prosecute a Chapter 11 plan, none

6  was advanced after the Chapter 11 trustee was appointed.  Though the Debtor, Mr. Weiner, along

7  with Mr. Lee and other purported allied creditors, had the opportunity to oppose the settlement of the

8  usury claims, oppose the proposed sales, or otherwise actively participate in this case after the

9  Chapter 11 trustee was appointed, they chose not to do so.

10       At the end of the day, this appears to be a tale of a financially troubled business debtor,

11  questionable financial tactics (procuring loans at usurious rates), insiders not identifying disqualifying

12  conflicts, insiders asserting unsupported claims which they don't attempt to defend once a trustee is

13  appointed, and the ultimate small Chapter 7 liquidation dividend distribution for creditors holding

14  general unsecured claims.

15  **REQUIREMENTS FOR CHAPTER 7 TRUSTEE'S FINAL REPORT**
**AND**
16  **OVERRULING THE OBJECTION TO THE FINAL REPORT**

17       11 U.S.C. § 704 requires a trustee to make a final report and file a final account of the

18  administration of the estate with the court and with the United States Trustee. The Code of Federal

19  Regulations requires that the Final Report contain the trustee's certification, under penalty of perjury,

20  that all assets have been liquidated or properly accounted for and that funds of the estate are available

21  for distribution.  28 C.F.R. § 58.7(a). That rule also incorporates 28 U.S.C. 589b(d) in requiring the

22  Final Report include:

23        (1) Summary of the trustee's case administration;

24        (2) Copies of the estate's financial records;

25        (3) List of allowed claims;

26        (4) Fees and administrative expenses; and

27        (5) Proposed dividend distribution to creditors.

28  *Id.*

1       Mr. Lee argues that the Final Report was improper because Trustee Flemmer never "certified"

2 his own fees and the fees of Trustees' Counsel to be reasonable. However, there is no such

3 requirement. It is the court's duty to determine whether the fees of trustees and professionals

4 employed thereby are reasonable, necessary, and proper under the Bankruptcy Code. Mr. Lee does

5 not contend that the Trustee's Final Report is not correct, but wants to attack the court's prior final

6 orders granting fees and expenses for professionals in this bankruptcy case

7       The Trustee's Final Report states all scheduled and known assets of the estate have been

8 reduced to cash and that remaining funds are available for distribution. Dckt. 395. Therefore, the

9 Final Report meets the requirement of 28 C.F.R. § 58.7(a).

10       The Objection to the Final Report is overruled.

11 **CONCLUSION**

12       The Objections to the fees of Trustee Flemmer and Trustees' Counsel are overruled. The

13 Objection to the Trustee's Final Report is overruled.

14       The court shall issue a separate order overruling the Objections. The court having filed

15 separate orders granting the applications for compensation, no further order thereon is necessary.

16 **Dated:** May 17, 2019                  **By the Court**

17

18

19

20                                   Ronald H. Sargis, Judge

                                  United States Bankruptcy Court

21

22

23

24

25

26

27

28

1
2

# Instructions to Clerk of Court
### Service List - Not Part of Order/Judgment

3  **The Clerk of Court is instructed to** send the Order/Judgment or other court generated document
transmitted herewith *to the parties below*.  The Clerk of Court will send the document via the
4  BNC or, if checked _____, via the U.S. mail.

5

| **Debtor**(s) | **Attorney for the Debtor**(s) (if any) |
|---|---|
| **Bankruptcy Trustee** (if appointed in the case) | Office of the U.S. Trustee<br>Robert T. Matsui United States Courthouse<br>501 I Street, Room 7-500<br>Sacramento, CA 95814 |
| J. Russell Cunningham, Esq.<br>1830 15th Street<br>Sacramento, CA 95811 | Don Lee<br>145 Jasper Way<br>San Andreas, CA 95249 |

6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28